NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-831

COMMONWEALTH

vs.

NELSON GIRON HERNANDEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury waived trial in the Superior Court, the defendant was convicted of two counts of aggravated rape of a child and two counts of indecent assault and battery on a child. The defendant appeals, arguing that a substantial risk of a miscarriage of justice occurred when the judge allowed the Commonwealth to refresh a witness's recollection without establishing that her memory was exhausted, and when the same witness testified about text messages between the defendant and the victim without proper authentication.  We affirm.

Background.  The defendant and the victim's mother (mother) were in a romantic relationship lasting several years; the defendant lived in the same apartment as the victim and the

mother during that time.  One Christmas morning, the victim woke up to the defendant's unzipping her pajamas and pulling down her underwear.  The defendant "then . . . started putting his tongue in [her] vagina and putting his fingers in, and licking [her] breast."

From then on, the defendant sexually abused the victim "[v]ery frequently."  He would kiss her and put his fingers and tongue in her vagina and his mouth on her nipples, and once made her touch and "jerk[]" his penis.  At some point the defendant bought the victim a phone and started sending her text messages saying that he loved her.[1]

In the spring of 2019, when the victim was around ten years old, the defendant moved out of the apartment after the mother ended their relationship.  This did not stop the defendant from continuing to sexually abuse the victim, however.  Although the defendant was not allowed in the apartment, he would enter the apartment while the mother and her new boyfriend were sleeping on the third floor and sexually abuse the victim in her second-floor bedroom.

In October 2019 the defendant climbed through the victim's bedroom window again and fell on top of her as she was lying in bed.  At that point a friend of the mother's boyfriend (friend)

---

[1] By the time of trial, the victim no longer had the phone.

2

entered the bedroom and saw the defendant and the victim together on the bed. The friend testified that the defendant was lying "flat . . . on top of" the victim, "had her by both wrists," and "was pinning her down." The defendant told the friend that she "should leave and that what [she] was seeing wasn't [her] business." After the police were called, they found the defendant sleeping in his car parked outside the apartment and arrested him. Deoxyribonucleic acid (DNA) testing later revealed that the defendant's DNA matched saliva found on the victim's bra and semen found on her bed sheets.

Discussion. 1. Refreshed recollection. At trial the mother, who was the designated first complaint witness, testified that the victim first told her about the sexual abuse when the defendant "came through the window," which occurred "a couple days before Halloween." This testimony was apparently inconsistent with what the mother had told a detective during a prior interview. As a result the prosecutor showed the mother a report from that interview and asked whether reading it refreshed her recollection about when the victim first told her about the sexual abuse. Although the mother answered yes, she then testified again that "the situation happened around Halloween" after the defendant "came through the window." Later, however, when the prosecutor specifically asked whether the victim disclosed the abuse "in the spring or summer," the

3

mother replied that "[i]t was after the [d]efendant moved out" in the spring and "then [she and the victim] had a whole conversation about that and then he came through the window."

For the first time on appeal, the defendant argues that this line of questioning was improper because the prosecutor did not establish that the mother's memory was exhausted before trying to refresh her recollection. "[T]he only prerequisite to refreshing [a witness's] recollection is a showing that the witness's memory is clearly exhausted." Commonwealth v. Sun, 490 Mass. 196, 214 (2022), quoting Commonwealth v. O'Brien, 419 Mass. 470, 478 (1995). Although the witness need not specifically state that her memory is exhausted, "it must be clear that the witness is experiencing a failure of memory, rather than either providing a response the examiner did not expect or indicating that . . . she never had knowledge of the subject of examination." Sun, supra. Because the defendant failed to object at trial, our review is limited to determining whether any error created a substantial risk of a miscarriage of justice. See Commonwealth v. Chase, 433 Mass. 293, 299 (2001).

Even assuming error, we discern no substantial risk of a miscarriage of justice. We are unpersuaded by the defendant's assertion that such a risk arose because the mother's testimony corroborated the victim's testimony regarding the timing of the first complaint. Even after the prosecutor tried to refresh the

4

mother's recollection, the mother's testimony was vague and confusing and did not enhance the victim's credibility to any meaningful degree.  Furthermore, the Commonwealth's case was strong and supported by evidence apart from the victim's and the mother's testimony.  As mentioned, an eyewitness saw the defendant on top of the victim in bed, and DNA evidence linked the defendant to the saliva on the victim's bra and the semen on her bed sheets.  In light of this evidence, we are not "left with uncertainty that the defendant's guilt has been fairly adjudicated."  Chase, 433 Mass. at 299.  Cf. Sun, 490 Mass. at 215 (prosecutor's refreshing of witness's recollection did not create substantial likelihood of miscarriage of justice given strength of other testimonial and physical evidence).

2.  Authentication.  Again for the first time on appeal, the defendant challenges the mother's testimony that she looked at the victim's phone and saw that "[t]hey [had] been texting back and forth to find out where I was, if I was sleeping, to open the door for him, he loves her, he missed her."  The defendant argues that this testimony was improper because the Commonwealth did not lay a foundation establishing that the defendant was the sender of the text messages.  See Commonwealth v. Lopez, 485 Mass. 471, 477 (2020) (requirement of authentication requires that proponent present "sufficient evidence that, if believed," would allow "a reasonable

5

[factfinder to] find by a preponderance of the evidence that the communication in question is what it is purported to be").

We discern no substantial risk of a miscarriage of justice from any failure by the Commonwealth to authenticate the text messages. Some of the mother's testimony was cumulative of the victim's testimony that the defendant sent her text messages saying that he loved her. In addition, the mother's testimony about the text messages was brief and peripheral to the Commonwealth's case. Given the strength of the Commonwealth's evidence, as discussed above, any error in the admission of this testimony did not create a substantial risk of a miscarriage of justice. See Chase, 433 Mass. at 299.

Judgments affirmed.

By the Court (Shin, Ditkoff & Tan, JJ.[2]),

Clerk

Entered: July 6, 2026.

---

[2] The panelists are listed in order of seniority.